## Illinois Central Railroad Company v. William B. May.

1. EVIDENCE—*Plaintiff Must Prove His Claim by a Preponderance of the Evidence.*—He who seeks to recover damages from another must prove his right to recover by a preponderance of the evidence which goes to establish the claim.

Trespass on the Case, for personal injuries. Appeal from the Circuit Court of Marion County; the Hon. WILLIAM M. FARMER, Judge presiding. Heard in this court at the August term, 1902. Reversed and remanded. Opinion filed March 2, 1903.

W. W. BARR, attorney for appellant; J. M. DICKINSON, of counsel.

F. F. Noleman, W. F. Bundy and J. J. Bundy, attorneys for appellee.

Mr. Presiding Justice Bigelow delivered the opinion of the court.

Appellee recovered a verdict and judgment in the Circuit Court of Marion County against appellant for the sum of $2,000, in an action on the case for a personal injury received by appellee while in the employ of appellant as a brakeman on its railroad, and the railroad company has brought the case here by appeal for review, and for a reversal of the judgment, because of errors committed by the court on the trial of the cause.

Appellee's counsel, not being satisfied with the statement of the case by counsel for appellant, have also furnished a statement, the substantive portion of which, we think, after reading the abstract of the record, is sufficient to a full understanding of the case, and is as follows:

"There were three counts in the declaration, but the appellee relies upon the first count, and this brief will be directed entirely toward the case, as delivered in the first count of the declaration. The gist of that count is, that the defendant, while the plaintiff was between two cars, attempting to couple same together, in the line of his duty, and while using due care and caution for his personal safety, with great force and violence, with one of its switch engines, with certain cars attached thereto, struck the rear end of the train which the plaintiff was attempting to couple, and shoved the same together, whereby the plaintiff's hand was caught between the bumpers and greatly mashed and broken and otherwise injured, requiring amputation.

The appellee, at the time of his injury, was in the employ of the appellant as rear brakeman on a regular freight train, and had been for several months prior thereto. His run was between Centralia and Champaign. On the evening in question he, together with a crew of which Burke was engineer and Moore conductor, started from the Centralia yards on their run to Champaign, with a train consisting of an engine and about forty-six cars, of which a portion, about thirteen, were bad-order cars, the bad-order cars being in the rear end of the train. The appellee

noticed, just before starting from the north end of the yards, that the coupler between two of the cars was not in proper condition, one of the knuckles being broken, requiring it to be coupled with a link and pin.    *   *   *   They started to pull out, and reached the north part of the Centralia yards, when the coupling pulled in two, on account of it not being well fitted.   The appellee gave a stop-signal, and brought the front end of the train to a standstill, and then set the brake on the caboose for the purpose of holding while coupling up again.    *   *   *

The engineer backed up till he just bumped the rear portion of the train, at which time the appellee, still standing out thirty or forty feet to the east, gave the standstill signal, which indicated that he had to go in between the cars to make the coupling.   The engineer undoubtedly knew that, anyway, for he knew that the train had broken in two.   The appellee then walked to the train, and noticed that the rear part had settled back, thereby taking up the slack, until there was about four inches between the two bumpers.   The link had gone in under the bumper of the north car, but was not bound nor tight.   The pin was bent and tight, and it took a little trouble to get it out.   The appellee had to get down and knock it out from below, or did so, at least, and then had to work the link out from underneath, which required a little time, the engineer and appellee agreeing that it was about six or seven minutes from the time that he gave the standstill signal until the engineer found out appellee was hurt.   He got the link and pin out, and on account of their being so close together, it took some time to work the link into its proper place, and while attempting to do so, the rear end of the train was shoved forward suddenly and mashed his hand in between the bumpers, and amputation was required.   The engineer of this train testified positively and unequivocally that he did not move his engine, and that it did not move from the time he was given the standstill signal until he afterward learned that the appellee was hurt.   *   *   *

There was a switching crew working in the yards just a little south and beyond where the caboose of the appellee's train was standing, switching cars backward and forward in their business of clearing the yards and making up and breaking up trains.   Engineer Pixley was the engineer of the switching crew.   There was no other power or force in reach of the rear end of the train that could have moved it up-grade except the switch engine or cars attached thereto.   Pixley testified that he did not strike it, and was

not within three hundred feet of it, but admitted that he was switching backward and forward there. There was a sharp conflict in the evidence on that point. * * *

The appellee contends that the evidence warranted the jury in finding that the switching crew of the defendant negligently struck the rear end of the train which the appellee was attempting to couple, shoving the cars together and mashing his hand. * * *

The appellant contends that the weight of the evidence is against the appellee as to whether the switching crew struck the rear end of appellee's train. The appellant also contends that, as a matter of law, the two crews were fellow-servants, and that the court should have given the peremptory instructions."

Appellee's statement of the facts of the case is as nearly correct as could be reasonably expected under the existing circumstances, and it clearly appears that appellee relies upon the first count of his declaration, which, his counsel contend, has been proven by a preponderance of the evidence, and if he is mistaken in this respect, the contention of appellant that the crew of the train of which appellee was a brakeman, and the crew of the switching train, which appellee claims caused his injury, were fellow-servants, need not be noticed, as the record stands.

It is a rule of law, so familiar as to be entitled to be denominated an axiom, that he who seeks to recover damages from another must prove his right to recover by a preponderance of the evidence which goes to establish the claim. If he fails in this he has no reason to complain when he goes away from the doors of a court empty-handed.

That appellee was severely injured can not be doubted, and that the injury was caused by the coming together of two cars of the train of which he was a brakeman, also can not be doubted; but these facts alone are not sufficient to entitle him to recover, and he must prove by a preponderance of the evidence, that the appellant was guilty of the act of negligence by running its switching train against the train of which appellee was a brakeman, as alleged in the first count of his declaration; and whether he has done so, appears to be the only question for us to determine. The

fact, if it is a fact, that appellant's switching train ran against the rear end of the train of which appellee was a brakeman, and so caused the injury to appellee, rests upon the testimony of appellee alone.

After appellee had testified that he had a long train, and that about thirteen of the cars on the rear end of his train were " bad-order " cars, which were being taken to a station north of Centralia for repairs, and had broken apart, and which he was trying to couple together, and the bumpers were four or five inches apart, and he was working to get the link between the knuckles, he testified as follows:

" Q.  Now what happened when you was working that in there?  What happened while you were working that link in there?  A.  Well, that yard crew came up from the rear and hit the caboose and knocked it on me.

Q.  Now what did it do to you?  A.  It mashed my left hand."

On cross-examination appellee testified as follows:

" Q.  Who was around there besides you, if any one, at the time you was making the coupling, and when you got hurt?  A.  There was no one there except the switch crew on the rear end.

Q.  Now, you didn't see them hit the train—the rear end of the train—did you?  A.  No, I didn't see them.

Q.  Now, then, what makes you think they did hit it—just because the cars came up?  A.  Just simply because there was no other power that could cause them to move except that.

Q.  That makes you think they hit it, and because you think the track inclined south a little bit, if anything?  A. Yes, sir.

Q.  And there would have to be something powerful to hit the rear end of the train before it would come up against you?  A.  Yes, it certainly would.

Q.  Now that is all you know about that?  A.  Which?

Q.  About the crew hitting your train?  A.  I know that they were right in the rear.

Q.  You knew they were in the rear working?  A.  Yes, sir.

Q.  You had known that?  A.  Yes, I knew that.  I knew they were there and that they were coming that way, and that nothing else could have moved those cars unless they did.

Q.  Was it dark?  A.  Yes, it was dark.

Q.  How long had it been dark that evening before you was hurt?  A.  Oh, I don't know; it had been some bit. It was in April and cloudy weather, and this was 7:55 P. M., and you come as near telling how long it was as I can."

If appellee had testified that he saw the switching train strike the caboose car of his train, or even if he had testified that he saw the north end of the car which he was trying to couple to the car next north of it, moving north, if only for an instant of time before his arm was caught between the bumpers, there would be some ground, though but slight, for him to believe that the switching train had run against the caboose car, and so caused the injury complained of; but since he gave no such testimony, we are unable to see how he could reasonably come to the conclusion that the switching train collided with the caboose car, even in a slight manner. He has simply built a theory, with no substantial proof to sustain it, and a verdict based on such testimony should not be allowed to stand, even if there was no counter-testimony in the case. If the switching train ran into or against the caboose car of appellee's train, surely the crew, or some of them, must have known it, and if any of them did know it, why did not appellee have them subpoenaed as witnesses in his behalf, or give some reason for not doing so?

It was not for the appellant to prove that the switching train did not run against the caboose car of appellee's train until appellee had proven something more than mere conjecture, not based on facts, that it did so; but Pixley, the engineer of the switching train, testified emphatically that his train did not run against the caboose of appellee's train, and that his train was not within 300 feet of appellee's train the evening appellee was injured. He was a disinterested witness, and was so situated that if there was a collision between his train and any part of appellee's train he must have known it; he could not easily have been mistaken, and he either willfully perjured himself or he told the truth. No witness who knew the facts has contradicted him, for appellee has not testified to any facts known to

himself, that are in conflict with Pixley's testimony. Appellee's testimony, aside from the fact that he was very seriously injured, is made up of suppositions and conjectural opinions, which he may believe to be true, but that does not make them so; and if such testimony is held to overcome such evidence as Pixley gave, there will be but little incentive for honest men to tell the truth.

Something might be said of the possibility that the engineer of appellee's train, because of a false signal supposed to have been received from appellee in the darkness of the evening, set his train in motion backward, believing the coupling of the cars had been conpleted; but this theory, in the face of the engineer's testimony, should have no weight; and there is no reason for believing that either engineer did not testify to the truth, and there is no reason that we can discover why one engineer should be believed and the other discredited.

A still more plausible theory might be advanced as the cause of the cars coming together and injuring appellee, based on the fact that thirteen of the cars at the rear end of appellee's train were out of repair and were being taken to the repair shops, some fastened together with chains and some by various kinds of couplers, and that in some unknown way, arising out of the unnatural condition of the cars, one or more of them was made to come against the car that appellee was trying to make a coupling with, and so caused the injury complained of. But this, like appellee's theory, is a guess, and does not rise to the dignity of being legal evidence. The court erred in not granting appellant's motion for a new trial, because the verdict was against the evidence, and for this error the judgment is reversed and the cause remanded.